THE BRONX HOUSEHOLD OF FAITH, Robert Hall and Jack Roberts, Plaintiffs,

v.

THE BOARD OF EDUCATION OF THE CITY OF NEW YORK and Community School District No. 10, Defendants.

No. 01 Civ. 8598(LAP).

United States District Court, S.D. New York.

June 26, 2002.

Joseph P. Infranco, Migliore & Infranco, P.C., Commack, NY, Rena Marie Lindevaldsen, Esanu, Katsky, Korins & Siger, L.L.P., New York, NY, Benjamin W. Bull, Jordan W. Lorence, Alliance Defense Fund Law Center, Scottsdale, AZ, for Bronx Household of Faith, Robert Hall, Jack Roberts.

Lisa Grumet, Corp. Counsel of City of N.Y., Brooklyn, NY, for Board of Educ. of City of N.Y., Community School Dist. No. 10.

## OPINION

PRESKA, District Judge.

Plaintiffs The Bronx Household of Faith, Robert Hall and Jack Roberts bring this action against defendants Board of Education of the City of New York and Community School District No. 10 ("School District") alleging violations of the Free Exercise, Free Speech, Free Assembly and Establishment Clauses of the First Amendment, the Equal Protection Clause

and Sections 3, 8 and 11 of Article I of the New York Constitution. Plaintiffs move for a preliminary injunction to prevent defendants from denying plaintiffs' application to rent space in Public School M.S. 206B, Anne Cross Merseau Middle School ("M.S.206B"), for Sunday morning meetings that include religious worship. For the reasons set forth below, the motion for a preliminary injunction is granted.

## BACKGROUND

*Bronx Household—District Court*

In 1995, plaintiffs brought an action in this Court challenging the School District's denial of plaintiffs' request to rent space in M.S. 206B in September 1994 for Sunday morning meetings that include religious worship. *Bronx Household of Faith v. Cmty. Sch. Dist. No. 10*, No. 95 Civ. 5501(LAP), 1996 WL 700915, at *1 (S.D.N.Y. Dec.5, 1996). The School District's denial was based on its "Standard Operating Procedures: Topic 5: Regulations Governing the Extended Use of School Facilities" ("SOP") and New York Education Law § 414 (McKinney's 1995), both of which prohibited rental of school property for the purpose of religious worship. *Id.* Specifically, section 5.9 of the SOP provided:

> No outside organization or group may be allowed to conduct religious services or religious instruction on school premises after school. However, the use of school premises by outside organizations or groups after school for the purpose of discussing religious material or material which contains a religious viewpoint or for distributing such material is permissible.

*Id.* New York Education Law § 414 provided that school facilities could be used for meetings, with the following exception:

> [S]uch use shall not be permitted if such meeting, entertainments and occasions are under the exclusive control, and the said proceeds are to be applied for the benefit of a society, association or organization of a religious sect or denomination, or of a fraternal, secret or exclusive society or organization. . . .

*Id.* at *2.

In considering plaintiffs' free speech claim, I found that the School District had created a limited public forum and that its regulations "constitute[d] reasonable regulations of expression related to the legitimate government concern of preserving and prioritizing access to the Middle School primarily for educational purposes and, secondarily, for nonexclusive public and community activities." *Id.* at *6. I denied plaintiffs' motion for summary judgment and granted defendants' cross-motion for summary judgment. *Id.*

*Bronx Household—Court of Appeals*

The Court of Appeals affirmed the judgment, *see* 127 F.3d 207 (2d Cir.1997), and the Supreme Court denied certiorari, *see* 523 U.S. 1074, 118 S.Ct. 1517, 140 L.Ed.2d 670 (1998). In connection with its holding that M.S. 206B was "not an open public forum as that term has been defined by the Supreme Court," *Bronx Household*, 127 F.3d at 213, the Court of Appeals noted the distinction made by the Supreme Court in, *inter alia, Rosenberger v. Rector & Visitors of the Univ. of Virginia*, 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995), and *Lamb's Chapel v. Center Moriches Union Free School District*, 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993), "between discrimination against speech because of its subject matter, considered permissible to preserve the purposes of the limited forum, and viewpoint discrimination, considered impermissible if directed against speech within the limitations of the forum." *Bronx Household*, 127 F.3d at 213 (citations omitted). The Court found that:

SOP 5.9 preserves that distinction by prohibiting religious worship and religious instruction by outside groups, a prohibition that state authorities consider necessary to preserve the purposes of the limited public school forum, and by specifically permitting religious viewpoint speech in relation to matters for which the public school forum is open. *Id.* The Court found the regulations to be reasonable, ("[w]e think that it is reasonable in this case for a state and a school district to adopt legislation and regulations denying a church permission to use school premises for regular religious worship" (*id.* at 214)), and the regulations to be viewpoint neutral, (*id.* at 215). In so finding, the Court noted that:

> the regulation in question specifically permits any and all speech from a religious viewpoint. What it does not permit is religious worship services.

*Id.* In elaborating on the distinction, the Court observed that:

> [t]he purposes for which the schools in District # 10 have been opened to outside organizations encompass a wide variety of civic and social uses, and any speech conducted in connection with those uses may be bottomed on a religious viewpoint. Worship and religious instruction are forms of speech and cannot be prohibited in an open forum such as a public university. *See Widmar [v. Vincent],* 454 U.S. [263,] 269 n. 6, 102 S.Ct. [269,] 274 n. 6 [1981]. Indeed, religious worship services may well be considered the ultimate in speech from a religious viewpoint in an open forum. But the question is whether a distinction can be drawn between it and other forms of speech from a religious viewpoint that District # 10 has elected to allow in the limited forum of a public middle school. We think it can.

*Id.* at 214–15. Indeed, the Court of Appeals was of the opinion that the "distinc-

tion between [discussion of secular matters from a religious viewpoint] on one hand, and religious services and instruction on the other, is not difficult for school authorities to make." *Id.* at 215.

*Good News Club—Court of Appeals*

Approximately two and one-half years after its decision in *Bronx Household,* the Court of Appeals decided *The Good News Club v. Milford Central School,* 202 F.3d 502 (2d Cir.2000), *rev'd,* 533 U.S. 98, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001), which affirmed the District Court's grant of summary judgment to a defendant school district. There, The Good News Club ("Good News Club" or the "Club"), "a community-based Christian youth organization open to children between the ages of six and twelve," *id.* at 504, sought to use school facilities for after-school meetings of children with parental permission to "have 'a fun time of singing songs, hearing [a] Bible lesson and memorizing scripture.'" *Id.* at 507. The Milford Central School District ("Milford") had adopted a policy in accordance with New York Education Law § 414 (the "Community Use Policy"). *Id.* at 504. The Community Use Policy stated that residents of the district could use school facilities for "holding social, civic and recreational meetings and entertainment events and other uses pertaining to the welfare of the community, provided that such uses shall be nonexclusive and shall be open to the general public." *Id.* The Community Use Policy, however, also indicated that:

> [s]chool premises shall not be used by any individual or organization for religious purposes. Those individuals and/or organizations wishing to use school facilities and/or grounds under this policy shall indicate on a Certificate Regarding Use of School Premises form provided by the District that any intend-

ed use of school premises is in accordance with this policy.

*Id.* The parties agreed that the school district had opened a limited public forum. *Id.* at 509. Finding that the proposed use was "the equivalent of religious worship . . . rather than the expression of religious views or values on a secular subject matter," the Interim Superintendent of Schools in Milford denied the Club's request, *id.* at 507, and the District Court upheld that denial, *id.* at 508.

On appeal, the Court of Appeals reviewed the activities proposed by the Club. It noted that as children arrived for the meetings, those who recalled and recited a "memory verse" from the previous meeting were rewarded with a prize. *Id.* at 504. The meeting officially began with a prayer recited by a minister, and the group sang The Good News theme song, which refers to Christ. *Id.* at 504–05. The next portion of the meeting

> involves a "moral or value" lesson centered around a verse from either the Old or the New Testament and its teaching. To learn the "memory verse" for the lesson, the Club members play games that focus on repetition of the verse. Next, the children are told a Bible story that emphasizes the same moral value that is represented in the day's memory verse. The story concludes with a "challenge and invitation" segment, which challenges the children to live by the value taught in the day's lesson through trust in God and Jesus Christ. Depending on the elapsed time, when the story is concluded, the group leader may ask the children questions about the story or play a game that emphasizes the teaching in the story. The group may also sing a song that relates to the story.

*Id.* at 505.

In arguing that Milford's application of the Community Use Policy was not viewpoint neutral, the Club noted that just like the Boy Scouts, Girl Scouts and 4–H Clubs, it taught moral values and argued that it was excluded from school facilities because it sought to teach moral values from a Christian viewpoint. *Id.* at 509. The majority found that the Club's argument that the restriction was unreasonable was foreclosed by its holding in *Bronx Household. See id.* ("[I]t is a proper state function to decide the extent to which church and school should be separated in the context of the use of school premises." (quoting *Bronx Household,* 127 F.3d at 214)). More specifically, the majority responded that "[t]hough [the Club's] teachings may involve secular values such as obedience or resisting jealousy, the Christian viewpoint, as espoused by Reverend Fournier [, pastor of Milford Center Community Bible Church, husband of one of the plaintiffs and father of another,] contains an additional layer:

> [T]hese morals or these values are senseless without Christ, that's to the children who know Christ as Savior, we would say, you know you cannot be jealous because you know you have the strength of God. To the children who do not know Christ, we would say, you need Christ as your Lord and Savior so that you might overcome these, you know, feelings of jealousy."

*Id.* at 509–10 (footnote omitted).

Thus, the majority concluded that the Club "is doing something other than simply teaching moral values. . . . [It is] focused on teaching children how to cultivate their relationship with God through Jesus Christ. Under even the most restrictive and archaic definitions of religion, such subject matter is quintessentially religious." *Id.* at 510. The majority observed that, as had been noted in the Court's opinion in *Bronx Household,* it was not difficult to discern that "the activities of the Club fall clearly on the side of religious instruction and prayer," *id.,* and that the Club's activities could be readily compared

to "religious worship," *id.* The majority rejected the Club's argument that its activities were akin to the Boy Scouts', Girl Scouts' and 4–H Clubs' teaching of moral values, albeit from a Christian viewpoint. It found, for example, that:

[w]hile the Boy Scouts teach reverence and a duty to God generally, this teaching is incidental to the main purpose of the organization, which is personal growth and development of leadership skills. Moreover, there is nothing in the record to indicate that the Boy Scouts require any particular means of demonstrating reverence and duty to God. Similarly, the Girl Scouts vow to "try ... [t]o serve God and [their] country."

*Id.* at 511 (footnote omitted). Accordingly, the majority found that the school excluded the Club on the basis of "content, not viewpoint." *Id.*

In dissent, Judge Jacobs criticized the majority's finding that the school district excluded the Club on the basis of content, not viewpoint. He wrote:

The majority rules against Good News nevertheless on the basis of two complementary distinctions. First, although the school district would be obliged to accept "an organization seeking to teach morals from a religious perspective," the school district is not obliged to accept a "religious youth organization that proposed religious instruction and prayer." *See* Maj. Op. at 508. Second, the majority emphasizes that the Club discusses "religious material through religious instruction and prayer" rather than "secular subjects from a religious viewpoint." *See* Maj. Op. at 510 (citing *Bronx Household of Faith,* 127 F.3d at 215).

On the basis of these two distinctions, the majority concludes that the Club's rejection was based solely upon the subject matter of its meetings and not upon its religious viewpoint. In my view, *when the subject matter is morals and*

*character, it is quixotic to attempt a distinction between religious viewpoints and religious subject matters.*

*Id.* at 512 (emphasis added) (Jacobs, J., dissenting). Judge Jacobs emphasized that "[t]he distinction between content discrimination and viewpoint discrimination is elusive and subtle," *id.* at 514, citing *Rosenberger,* 515 U.S. at 829, 115 S.Ct. 2510 ("Viewpoint discrimination is ... an egregious form of content discrimination."), and *Good News/Good Sports Club v. School District,* 28 F.3d 1501, 1506–07 (8th Cir.1994) ("[T]he Supreme Court has 'refused to cabin religious speech into a separate excludible speech category; rather, the Court [has] adopted a more expansive view, recognizing that a religious perspective can constitute a separate viewpoint on a wide variety of *seemingly* secular subject matter.'"). He then offered his analysis:

The school district allows use of its facilities by certain groups that focus on "moral development" of young people. The majority argues that the activities of the Club are "quintessentially religious," while the other groups deal only with the "secular subject of morality." Maj. Op. at 510. The fallacy of this distinction is that it treats morality as a subject that is secular by nature, which of course it may be or not, depending on one's point of view. Discussion of morals and character from purely secular viewpoints of idealism, culture or general uplift will often appear secular, while discussion of the same issues from a religious viewpoint will often appear essentially—quintessentially—religious.

"There is no indication when 'singing hymns, reading scripture, and teaching biblical principles' cease to be 'singing, teaching, and reading'—all apparently forms of 'speech,' despite their religious subject matter—and become unprotected 'worship.'" *Widmar v. Vincent,* 454 U.S. 263, 269 n. 6, 102 S.Ct. 269, 274 n. 6, 70 L.Ed.2d 440 (1981) (internal cita-

tion omitted). Because the Club's focus appears to be on teaching lessons for the living of a morally fit life, and not on worship, I believe that the Club's message is in fact the "teach[ing of] morals from a religious perspective," Maj. Op. at 508.

Even if one could not say whether the Club's message conveyed religious content or religious viewpoints on otherwise-permissible content, we should err on the side of free speech. The concerns supporting free speech greatly outweigh those supporting regulation of the limited public forum.

\* \* \* \* \* \*

Whenever public officials, in executing the school's access policy, evaluate private speech "to discern [its] underlying philosophic assumptions respecting religious theory and belief," the result is "a denial of the right of free speech." *Rosenberger*, 515 U.S. at 845, 115 S.Ct. at 2525.

*Id.* at 515 (Jacobs, J., dissenting).

### Good News Club—Supreme Court

The Supreme Court granted certiorari in *Good News Club* to resolve the "conflict among the Courts of Appeals on the question whether speech can be excluded from a limited public forum on the basis of the religious nature of the speech." 533 U.S. at 105, 121 S.Ct. 2093. In listing the cases evidencing the conflict, the Court included the Court of Appeals' opinion in *Bronx Household*, 127 F.3d 207, which it characterized as "concluding that a ban on religious services and instruction in the limited public forum was constitutional," for comparison to the Eighth Circuit's opinion in *Good News/Good Sports Club*, 28 F.3d 1501. *Good News Club*, 533 U.S. at 105–06, 121 S.Ct. 2093. Ultimately, the Court reversed the Court of Appeals' holding in *Good News Club* (thus casting doubt on the Court of Appeals' opinion in *Bronx Household* ).

In analyzing the Club's free speech claim, the Court accepted the parties' agreement that Milford had created a limited public forum. Justice Thomas, writing for the majority, noted that Milford had opened its facilities to events "pertaining to the welfare of the community," including "the development of character and morals from a religious perspective." *Id.* at 108, 121 S.Ct. 2093. But the Court disagreed with the Court of Appeals' belief "that its characterization of the Club's activities as religious in nature warranted treating the Club's activities as different in kind from the other activities permitted by the school." *Id.* at 110–11, 121 S.Ct. 2093. Justice Thomas wrote:

We disagree that something that is "quintessentially religious" or "decidedly religious in nature" cannot also be characterized properly as the teaching of morals and character development from a particular viewpoint. *See* 202 F.3d, at 512 (Jacobs, J., dissenting) ("[W]hen the subject matter is morals and character, it is quixotic to attempt a distinction between religious viewpoints and religious subject matters"). What matters for purposes of the Free Speech Clause is that we can see no logical difference in kind between the invocation of Christianity by the Club and the invocation of teamwork, loyalty, or patriotism by other associations to provide a foundation for their lessons. It is apparent that the unstated principle of the Court of Appeals' reasoning is its conclusion that any time religious instruction and prayer are used to discuss morals and character, the discussion is simply not a "pure" discussion of those issues. According to the Court of Appeals, reliance on Christian principles taints moral and character instruction in a way that other foundations for thought or viewpoints do not. We, however, have never reached such a conclusion. Instead, we reaffirm

our holdings in *Lamb's Chapel* and *Rosenberger* that speech discussing otherwise permissible subjects cannot be excluded from a limited public forum on the ground that the subject is discussed from a religious viewpoint. Thus, we conclude that Milford's exclusion of the Club from use of the school, pursuant to its community use policy, constitutes impermissible viewpoint discrimination.

*Id.* at 111, 121 S.Ct. 2093.

Of particular relevance here is the footnote following that holding that states:

Despite Milford's insistence that the Club's activities constitute "religious worship," the Court of Appeals made no such determination. It did compare the Club's activities to "religious worship," 202 F.3d at 510, but ultimately it concluded merely that the Club's activities "fall outside the bounds of pure 'moral and character development,'" *id.*, at 511. *In any event, we conclude that the Club's activities do not constitute mere religious worship, divorced from any teaching of moral values.*

Justice Souter's recitation of the Club's activities is accurate. See *post,* at

2116–2117 (opinion of Souter, J.). But in our view, religion is used by the Club in the same fashion that it was used by Lamb's Chapel and by the students in *Rosenberger:* religion is the viewpoint from which ideas are conveyed. We did not find the *Rosenberger* students' attempt to cultivate a personal relationship with Christ to bar their claim that religion was a viewpoint. And we see no reason to treat the Club's use of religion as something other than a viewpoint merely because of any evangelical message it conveys. According to Justice Souter, the Club's activities constitute "an evangelical service of worship." *Post,* at 2117. Regardless of the label Justice Souter wishes to use, what matters is the substance of the Club's activities, which we conclude are materially indistinguishable from the activities in *Lamb's Chapel* and *Rosenberger.*

*Id.* at 112 n. 4, 121 S.Ct. 2093 (emphasis added).

Justice Souter, joined by Justice Ginsburg, described the substance of the Club's activities in detail in his dissent [1] and, after

---

1. As Justice Souter detailed:

Good News's classes open and close with prayer. In a sample lesson considered by the District Court, children are instructed that "[t]he Bible tells us how we can have our sins forgiven by receiving the Lord Jesus Christ. It tells us how to live to please Him. . . . If you have received the Lord Jesus as your Savior from sin, you belong to God's special group—His family." App. to Pet. for Cert. C17–C18 (ellipsis in original). The lesson plan instructs the teacher to "lead a child to Christ," and, when reading a Bible verse, to "[e]mphasize that this verse is from the Bible, God's Word" and is "important—and true—because God said it." The lesson further exhorts the teacher to "[b]e sure to give an opportunity for the 'unsaved' children in your class to respond to the Gospel" and cautions against "neglect[ing] this responsibility." *Id.,* at C20.

While Good News's program utilizes songs and games, the heart of the meeting is the "challenge" and "invitation," which are repeated at various times throughout the lesson. During the challenge, "saved" children who "already believe in the Lord Jesus as their Savior" are challenged to "'stop and ask God for the strength and the "want" . . . to obey Him.'" *Ibid.* They are instructed that

"[i]f you know Jesus as your Savior, you need to place God first in your life. And if you don't know Jesus as Savior and if you would like to, then we will—we will pray with you separately, individually. . . . And the challenge would be, those of you who know Jesus as Savior, you can rely on God's strength to obey Him." *Ibid.* During the invitation, the teacher "invites" the "unsaved" children "'to trust the Lord Jesus to be your Savior from sin,'" and "'receiv[e][him] as your Savior from sin.'"

characterizing those activities as "an evangelical service of worship," *id.* at 138, 121 S.Ct. 2093 (Souter, J., dissenting), criticized the majority's rejection of that characterization as "merely semantic," *id.* at 138 n. 3, 121 S.Ct. 2093.

*Bronx Household's Present Application*

Following the *Good News Club* decision, on July 6, 2001, plaintiffs wrote a letter to Frank Pagliuca, the Director of School Facilities and planning for the School District. (Declaration of Frank Pagliuca, sworn to on Dec. 5, 2001 ("Pagliuca Decl."), Ex. A). Plaintiffs wrote that, in light of *Good News Club,* they were renewing their request to rent M.S. 206B. (*Id.*). Plaintiffs sought to meet at the school from 10 a.m. to 2 p.m. each Sunday morning, beginning on September 30, 2001, to engage in "singing," "the teaching of adults and children ... from the viewpoint of the Bible" and "social interaction among members of our church, in order to promote their welfare and the welfare of the community." (*Id.*). On September 5, 2001, Pagliuca responded that plaintiffs appeared to intend to use the school for the same purposes that the School District initially rejected in September 1994. (*Id.,* Ex. B). Plaintiffs allege that on or about August 16, 2001, Deborah King, an attorney for the Board of Education, informed plaintiffs' counsel that defendants "were denying [the application] because the meetings would violate the defendants' policy prohibiting religious services or instruction in the school buildings." (Compl.¶ 15).

Pursuant to the SOP, "[t]he primary use of school premises must be for Board of Education programs and activities." (SOP 5.3).[2] "After Board of Education programs and activities, preference will be given to use of school premises for community, youth and adult group activities." (*Id.* 5.5). The SOP also permits school premises to be used for, among other things, the following purposes:

5.6.1  For the purpose of instruction in any branch of education, learning or the arts; examinations; graduations;

5.6.2  For holding social, civic and recreational meetings and entertainment, and other uses pertaining to the welfare of the community; but such uses shall be non-exclusive and open to the general public;

.     .     .     .

5.6.5  For civic forums and community centers in accordance with applicable law.

(*Id.* 5.6, 5.6.1, 5.6.2, 5.6.5). The SOP specifically forbids any outside organization or group from "conduct[ing] religious services or religious instruction on school premises after school." (*Id.* 5.11). The SOP further provides, however, that "the use of school premises by outside organizations or groups after school for the purpose of

---

*Id.,* at C21. The children are then instructed that

"[i]f you believe what God's Word says about your sin and how Jesus died and rose again for you, you can have His forever life today. Please bow your heads and close your eyes. If you have never believed on the Lord Jesus as your Savior and would like to do that, please show me by raising your hand. If you raised your hand to show me you want to believe on the Lord Jesus, please meet me

so I can show you from God's Word how you can receive His everlasting life." *Ibid.*

*Id.* at 137–38, 121 S.Ct. 2093 (Souter, J., dissenting).

2.  The current version of the SOP, as opposed to the version that existed at the time of the first *Bronx Household* case, can be found at Exhibit A to the Declaration of John Musico, sworn to on December 5, 2001 ("Musico Decl.").

discussing religious material or material which contains a religious viewpoint or for distributing such material is permissible." (*Id.*).

Plaintiffs offer the following description of the types of activities that they seek to engage in at M.S. 206B:

> The Sunday morning meetings service consists of the singing of Christian hymns and songs, prayer, fellowship with other church members and Biblical preaching and teaching, communion, sharing of testimonies and social fellowship among the church members....
>
> In our church service, we seek to give honor and praise to our Lord and Savior Jesus Christ in everything we do. To that end we sing songs and hymns of praise to our Lord. We read the Bible and the pastors teach from it because it tells us about God, what He wants us to do and how we should live our lives....
>
> In keeping with ancient tradition, we have a light fellowship meal after the service, which consists basically of coffee, juice and bagels. This gives us opportunity to meet new people, talk to one another, share one another's joys and sorrows so as to be a mutual help and comfort to each other....
>
> The Sunday morning meeting is the indispensable integration point for our church. *It provides the theological framework to engage in activities that benefit the welfare of the community.* Those who attend the Sunday morning meetings are taught to love their neighbors as themselves, to defend the weak and disenfranchised, and to help the poor regardless of their particular beliefs. It is a venue where people can come to talk about their particular problems and needs. Over the years we have helped people with basic needs such as food, clothing, and rent. We have also provided, by means of counseling, friendship and encouragement, help for people to get out of the multi-generational welfare cycle, to lead productive lives, to leave a life of crime and/or drugs to become responsible citizens, and to counsel people whose personal finances are out of control....
>
> In one recent case we helped an individual who was about to get evicted. Church members helped him budget his income in order to meet his primary expenses, get rid of his excessive credit card debt and pay off overdue taxes. He now has a savings account of almost $1000.00. It is through the Sunday meeting where we directly or indirectly learn of these situations and where we can converse with the individuals involved in order to monitor the progress of the issue to be resolved....
>
> In years past, the church meeting was a very important place for Cambodian Refugees to come in order for us to get to know them so that we could help them with food, clothing and to help them get acclimated to American society. Most of them were Buddhists.

(First Affidavit of Robert Hall, sworn to on Dec. 13, 2001 ("Hall Aff."), ¶¶ 3–4, 7–9 (emphasis added)). The Sunday morning meetings "are open to all members of the public" and are "not closed to a limited group of people, such as church members and their guests." (*Id.* ¶ 5).

On September 10, 2001, plaintiffs filed a verified complaint in the instant action, seeking declaratory and injunctive relief against the School District and the Board of Education of the City of New York, both of whom were also defendants in the first case. As with the first case, plaintiffs assert here that the defendants' policy of excluding community groups from renting school buildings for purposes of "religious worship and religious instruction"—while allowing most other types of community groups to hold meetings in those build-

ings—"violates the Plaintiffs' rights of freedom of speech, freedom of assembly, free exercise of religion, equal protection under the law, and freedom from establishment of religion." (Compl.¶ 1). And as with the first case, plaintiffs challenge New York Education Law § 414 and the School District's SOP 5.9 (now re-numbered, with identical language, as SOP 5.11), as applied to the plaintiffs. (*Id.* ¶¶ 9, 20, 24; Declaration of John Musico, sworn to on Dec. 5, 2001 ("Musico Decl."), ¶ 13).[3] In the instant case, however, plaintiffs assert that the Supreme Court's decision in *Good News Club* effectively reversed the Court of Appeals' decision in *Bronx Household*, 127 F.3d 207. (Compl.¶ 11). Accordingly, plaintiffs allege, they renewed their request to the School District for permission to meet on Sunday mornings at M.S. 206B but were again denied permission for those meetings. (*Id.* ¶¶ 14–15).

## DISCUSSION

### I. Standard for Preliminary Injunction

■ A preliminary injunction generally may be granted when the moving party can establish both (1) irreparable harm and (2) either (a) a likelihood of success on the merits or (b) sufficient questions on the merits to "make them a fair ground for litigation and a balance of hardships tipping decidedly" in the movant's favor. *Warner–Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3, 6 (2d Cir.1996).

■ Generally, preliminary injunctions are prohibitory in nature, designed to "maintain the status quo pending a trial on

the merits." *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir.1995). Where, however, the terms of an injunction would "alter, rather than preserve, the status quo by commanding some positive act, the injunction is mandatory." *Air Transport Int'l, LLC v. Aerolease Fin. Group, Inc.*, 993 F.Supp. 118, 123 (D.Conn.1998) (citing *Tom Doherty*, 60 F.3d at 34). "To obtain a mandatory injunction, the moving party must demonstrate a clear or substantial likelihood of success on the merits, or that it will suffer extreme or very serious damage if denied preliminary relief." *Anderson v. Mexico Acad. & Cent. Sch.*, 186 F.Supp.2d 193, 201 (N.D.N.Y.2002) (citing *Tom Doherty*, 60 F.3d at 34).[4]

Here, plaintiffs seek, *inter alia*, to require defendants to grant plaintiffs' request to rent space in M.S. 206B for Sunday morning meetings that include religious worship. Plaintiffs currently hold their meetings either in a large house or under a canopy on a piece of property they own. (Hall Aff. ¶ 10). If plaintiffs' preliminary injunction request is granted and plaintiffs are permitted to hold their meetings at M.S. 206B, the status quo would be altered. Accordingly, because plaintiffs seek mandatory injunctive relief, they must meet a higher burden of proof before such relief will be granted.

### II. Irreparable Harm

■ Plaintiffs' claims implicate, *inter alia*, their First Amendment free speech

---

3. With the exception of certain changes made in October 2001 to Topic 5 of the SOP concerning political activities, the content of the SOP remains the same as it was at the time of plaintiffs' earlier application. (Musico Decl. ¶ 10).

4. As the Court of Appeals has observed, "[t]he distinction between mandatory and prohibito-

ry injunctions is not without ambiguities or critics. Determining whether the status quo is to be maintained or upset has led to distinctions that are 'more semantic[ ] than substantive.' " *Tom Doherty*, 60 F.3d at 32 (quoting *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir.1985)).

rights. (*See, e.g.,* Compl. ¶¶ 16–21). In *Amandola v. Town of Babylon*, 251 F.3d 339, 343 (2d Cir.2001), the Court of Appeals recognized that it "has not spoken with a single voice on the issue of whether irreparable harm may be presumed with respect to complaints alleging the abridgement of First Amendment rights." The great majority of recent cases in this Circuit, however, have found that such irreparable harm may be presumed. *See, e.g., Derusso v. City of Albany*, No. 1:01–CV–699 (FJS/RFT), 2002 WL 1275466, at *2 (N.D.N.Y. June 4, 2002); *Herschaft v. City of New York*, No. 02–CV–677 (CBA)(LB), 2002 WL 1204780, at *6 (E.D.N.Y. Feb. 15, 2002); *Anderson*, 186 F.Supp.2d at 202 ("[I]f plaintiffs sustain their allegation that Mexico Academy's exclusion of their bricks from the walkway violates their First Amendment rights, they will have established irreparable harm."); *People for the Ethical Treatment of Animals v. Giuliani*, 105 F.Supp.2d 294, 303 (S.D.N.Y.2000) ("'Because First Amendment rights are presumed irreparable,' allegations directly implicating these rights by their 'very nature,' satisfy the irreparable injury requirement for a preliminary injunction." (quoting *Tunick v. Safir*, 209 F.3d 67, 70 (2d Cir.2000))), *aff'd*, 18 Fed. Appx. 35 (2d Cir.2001); *see also Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) ("[L]oss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

Here, plaintiffs allege that defendants' denial of their application has deprived them of various constitutional rights, including their First Amendment free speech rights. (Compl. ¶¶ 16–21). Based on the authorities noted above, I find that because of the importance of these rights, going to the very foundation of our liberties, plaintiffs have demonstrated that they will suffer damage of the most serious kind if an injunction is not issued.[5]

### III. Likelihood of Success on the Merits

■ The lengthy background section provided above is sufficient at least to determine that the Supreme Court has cast doubt upon the Court of Appeals' majority opinion in *Bronx Household*. Because there has been a change in the law, another look at the situation is justified.[6] Concomitantly, the change in the law is sufficiently serious to reject defendants' assertion that plaintiff's preliminary injunction motion should be denied on the grounds of *res judicata* or collateral estoppel. As the Court of Appeals recently instructed, "[r]es judicata and collateral estoppel do not cement the *status quo* into perpetuity. '[M]odifications in "controlling legal principles" could render a previous determination inconsistent with prevailing doctrine,' and changed circumstances may sufficiently alter the factual predicate such that new as-applied claims would not be barred by the original judgment." *Mona-*

---

**5.** That plaintiffs "do not want to meet permanently" in M.S. 206B but need additional space until their building is constructed, (Hall Aff. ¶ 11), has no legal effect on the present and continuing interference with, *inter alia,* their First Amendment free speech rights.

**6.** I note that plaintiffs did not file a motion for reconsideration pursuant to Rule 60(b)(6) of the Federal Rules of Civil Procedure, which "can be granted if there is an intervening change of controlling law." *Stone v. 866 3rd*

*Next Generation Hotel, LLC,* No. 99 Civ. 4780(LTS)(KNF), 2002 WL 655591, at *1 (S.D.N.Y. Apr. 19, 2002) (citing *Virgin Atlantic Airways v. Nat'l Mediation Bd.,* 956 F.2d 1245, 1255 (2d Cir.1992)). Rather, plaintiffs filed an entirely new complaint, in which the two defendants were also defendants in the first case. The third defendant from the first case—Charles Williams, in his official capacity as the President of the Board of Education for the School District—is not a defendant in the instant case.

*han v. New York Dep't of Corr.,* 214 F.3d 275, 290 (2d Cir.2000) (citations omitted).

## A. Free Speech

There is no argument that the law or the facts have changed as to the nature of the forum opened by the School District. Accordingly, based on principles of collateral estoppel, I deny reconsideration of that finding and adhere to my prior holding, affirmed by the Court of Appeals, (*see Bronx Household,* 1996 WL 700915, *aff'd,* 127 F.3d 207), that defendants have opened a limited public forum at M.S. 206B.

In *Good News Club,* the Supreme Court recited the familiar test applicable to speech in limited public fora:

> When the State establishes a limited public forum, the State is not required to and does not allow persons to engage in every type of speech. The State may be justified "in reserving [its forum] for certain groups or for the discussion of certain topics." The State's power to restrict speech, however, is not without limits. The restriction must not discriminate against speech on the basis of viewpoint, and the restriction must be "reasonable in light of the purpose served by the forum."

533 U.S. at 106–07, 121 S.Ct. 2093 (citations omitted). It was the Court's application of this test in *Good News Club* that shifted the seeming firmament on which the prior decisions in *Bronx Household* were based.

### 1. Plaintiffs' Activities Do Not Constitute "Mere Religious Worship"

As noted above, the Court granted certiorari in *Good News Club* to resolve "the conflict among the Courts of Appeals on the question of whether speech can be excluded from a limited public forum on the basis of the religious nature of the speech." *Id.* at 105, 121 S.Ct. 2093. The Court of Appeals' *Bronx Household* deci-

sion (which the Court characterized as "concluding that a ban on religious services and instruction in the limited public forum was constitutional," (*id.* at 105–06, 121 S.Ct. 2093)), was one that the conflict was resolved against. Specifically, the Supreme Court disagreed with the Court of Appeals' belief in *Good News Club* that "characterization of the Club's activities as religious in nature warranted treating the Club's activities as different in kind from the other activities permitted by the school." *Id.* at 110–11, 121 S.Ct. 2093. Also, in contrast to the Court of Appeals' view in *Bronx Household* that a distinction can be drawn without difficulty between religious worship services and other forms of speech from a religious viewpoint, *see* 127 F.3d at 214–15, the Court cited to Judge Jacobs' dissent in *Good News Club* where he termed attempts to make such a distinction "quixotic" when the subject is morals and character. *Good News Club,* 533 U.S. at 111, 121 S.Ct. 2093 (quoting *Good News Club,* 202 F.3d at 512 (Jacobs, J., dissenting)). The Court specifically held that, in its assumed limited public forum, Milford could not prohibit activities that, while "quintessentially religious," were not "mere religious worship, divorced from any teaching of moral values." *Id.* at 111 & 112 n. 4, 121 S.Ct. 2093.

■ Applying the Court's holding in *Good News Club* to the facts at issue, plaintiffs have demonstrated a substantial likelihood of success in showing that the School District's rejection of plaintiffs' application violates their First Amendment free speech rights. As noted above, in *Good News Club,* the Court held that Milford could not prohibit activities such as prayer and religious instruction—activities characterized by the Court as "quintessentially religious"—that were otherwise consistent with Milford's policy of permitting "teaching of morals and character development from a particular viewpoint." *Id.* at 111, 121 S.Ct. 2093. While declining to

label the activities there at issue, the Court noted that they were not "mere religious worship, divorced from any teaching of moral values." *Id.* at 112 n. 4, 121 S.Ct. 2093.

Here, like in *Good News Club,* the Church's proposed activities cannot be categorized as "mere religious worship, divorced from any teaching of moral values" or other activities permitted in the forum.[7] Certain activities the Church seeks to engage in are "quintessentially religious," *e.g.,* prayer and communion (Hall Aff. ¶¶ 3–4), and, if conducted in isolation, could arguably fall within the category of mere religious worship. The other proposed activities, however, are clearly consistent with the type of activities previously permitted in the forum and consistent with activities expressly permitted by the School District's SOP. As SOP 5.6 states, "school premises may . . . be used for the following purposes: . . . [f]or holding social, civic and recreational meetings and entertainment, and other uses pertaining to the welfare of the community." Plaintiffs' proposed activities include several benefitting the welfare of the community:

Over the years we have helped people with basic needs such as food, clothing, and rent. We have also provided, by means of counseling, friendship and encouragement, help for people to get out of the multi-generational welfare cycle, to lead productive lives, to leave a life of crime and/or drugs to become responsible citizens, and to counsel people whose personal finances are out of control.

(Hall Aff. ¶ 7; *see also* Letter from Hall and Roberts to Pagliuca of 7/6/01 (referring to the "welfare of the community")). The proposed activities also include the teaching of moral values—another activity benefitting the welfare of the community. (Hall Aff. ¶ 7) ("Those who attend the Sunday morning meetings are taught to love their neighbors as themselves, to defend the weak and disenfranchised, and to help the poor regardless of their particular beliefs."). Further, the proposed activities include singing, socializing and eating—clearly recreational activities. (*Id.* ¶¶ 3, 5–8). Therefore, the facts presented here fall squarely within the Supreme Court's precise holding in *Good News Club:* the activities are not limited to "mere religious

---

7. The significance of the identification of those activities permitted in a particular forum—the teaching of moral values in *Good News Club*—is highlighted by *Amandola,* 251 F.3d 339, which was decided prior to the Supreme Court's *Good News Club* decision. There, a church and its pastor brought suit against the Town of Babylon (the "Town") and James Namely, the Town's Commissioner of General Services. *Id.* at 341. Plaintiffs had applied to use the Town Hall Annex, a limited public forum, "for purposes of Bible study" every Thursday evening and Sunday morning. *Id.* Plaintiffs' application was approved, and they met three times. *Id.* After that, the pastor advertised in a local classified ad that the church was opening its services to the public "as a 'new ministry' and inviting the public to attend its Thursday evening Bible study meetings and Sunday morning services at the Annex." *Id.* Shortly thereafter, the Town revoked plaintiffs' permit. *Id.*

Plaintiff then commenced the action and moved for a preliminary injunction. *Id.*

The Court of Appeals held that the Town's revocation of plaintiffs' permit was a violation of plaintiffs' First Amendment right to free speech. *Id.* at 344. The Court reasoned that:

[b]ecause the written policy itself was utterly silent on the issue of whether the Annex could be used for religious activities of any kind, it could not serve as the basis for a reasonable, viewpoint neutral exclusion from the Annex of religious worship services, such as those conducted by the Church.

*Id.* Specifically, the Court noted that because the Town had the right to refuse or terminate permission to use the Annex "for any reason," Namely had "unfettered discretion 'to discriminate based on the content or viewpoint of speech,'" which was impermissible under the First Amendment. *Id.* (citation omitted).

worship" but include activities benefitting the welfare of the community, recreational activities and other activities that are consistent with the defined purposes of the limited public forum.[8] Pastor Hall's testimony that "the Sunday morning meeting ... provides the theological framework to engage in activities that benefit the welfare of the community" demonstrates that plaintiffs engage in those permitted activities from a religious viewpoint. Accordingly, plaintiffs have demonstrated a substantial likelihood that the denial of their application is contrary to the holding of *Good News Club*.

### 2. "Worship" is Not an Activity Different in Kind from Activities Previously Permitted in the Forum

■ In Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for a Preliminary Injunction, defendants argue that *Good News Club* is inapplicable because the present case involves worship and the Court of Appeals in *Bronx Household* found that worship is different in kind from other activities allowed in the limited public forum. (Defs.' Mem. Opp'n P.I. at 26; *see Bronx Household*, 127 F.3d at 214–15 (observing that "a distinction can be drawn between [religious worship services] and other forms of speech from a religious viewpoint" that are allowed in "the limited forum of a public middle school")). Defendants also argue that plaintiffs' proposed activities should not be analyzed according to their component parts because the "context" of these activities is different:

The activities which make up the service cannot be viewed as discrete, as they are linked by the overarching purpose of religious worship, and also by ceremony

**8.** It should be noted that while plaintiffs' proposed activities include, *inter alia,* the teaching of moral values, and, thus, are not "mere religious worship, divorced from any teaching of moral values" within the meaning of *Good News Club'*s footnote 4, the teaching of moral values is not necessarily required. In *Good News Club*, Milford opened its forum to, *inter alia,* events "pertaining to the welfare of the community" which Milford interpreted as permitting use by any group that "promote[s] the moral and character development of children." 533 U.S. at 108, 121 S.Ct. 2093 (citing appellees' briefs to the Court of Appeals). The Club argued, and the Supreme Court agreed, that the Club's activities, in fact, involved promoting moral and character development of children, albeit from a religious perspective. Thus, the Club's activities were found to be within the range of activities for which the forum had been opened. Accordingly, *Good News Club* referred to the teaching of moral values. Footnote 4, however, may be interpreted more broadly to mean that the only type of activity that may arguably be banned is mere religious worship, divorced from any activities consistent with the types of activities otherwise permitted in the limited public forum.

This point is illustrated in *DeBoer v. Village of Oak Park*, 267 F.3d 558 (7th Cir.2001), a post-*Good News Club* case. There, the Seventh Circuit held that a village had engaged in viewpoint discrimination by refusing to allow plaintiffs to use the Village Hall as part of National Day of Prayer. The Village's Use Policy, which governed the use of the Village Hall by members of the public, provided that the event at issue must, *inter alia,* "have as its primary purpose providing a civic program or activity which benefits the public as a whole." *Id.* at 561. The Seventh Circuit found that the National Day of Prayer assembly was, in fact, a "civic program or activity" and that, "[i]n adopting the philosophical and theological position that prayer, the singing of hymns and the use of Bible commentary can never be 'civic,' the Village has discriminated against the speech of those of its citizens who utilize these forms of expression to convey their point of view on matters relating to government." *Id.* at 568. The Seventh Circuit later provided the following parenthetical to *Good News Club*, 533 U.S. at 112 n. 4, 121 S.Ct. 2093: "(concluding that the Club's activities did not constitute 'mere religious worship, divorced from any teaching of moral values [a permissible subject matter in the forum]')." *DeBoer*, 267 F.3d at 570 n. 11 (brackets in original).

and ritual. · Participation in a religious service involves more than religious belief or expression of belief; it involves organized conduct in exercise of religion. *See Employment Division v. Smith*, 494 U.S. 872, 884–85, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) ("The 'exercise of religion' often involves not only belief and profession but the performance of (or abstention from) physical acts: *assembling with others for a worship service*, participating in sacramental use of bread and wine, proselytizing, abstaining from certain foods or certain modes of transportation.") (emphasis added). Worship services may involve rituals with special significance for a particular religious faith.

(Defs.' Mem. Opp'n P.I. at 27).

First, the argument that plaintiffs' activities should not be analyzed according to their component parts is precluded by *Good News Club*. As noted above, the majority dismissed attempts to label the activities there at issue but concluded that regardless of the label applied, "what matters is the substance of the Club's activities." *Good News Club*, 533 U.S. at 112 n. 4, 121 S.Ct. 2093; *see also Widmar*, 454 U.S. at 265 n. 2, 102 S.Ct. 269 ("A typical Cornerstone meeting included prayer, hymns, Bible commentary and discussion of religious views and experiences."). Defendants' argument to the contrary is thus unavailing.

Second, defendants' position that religious services or worship are distinct activities not comparable to other activities in the limited public forum is also precluded by *Good News Club*.[9] There, as noted above, the majority rejected the Court of Appeals' treatment of activities that are "decidedly religious in nature" or "quintessentially religious" as "differen[t] in kind" from other permitted activities. *Good News Club*, 533 U.S. at 111, 121 S.Ct. 2093.[10] Instead, the majority "reaffirm[ed] [the Court's] holdings in *Lamb's Chapel* and *Rosenberger* that speech discussing otherwise permissible subjects cannot be excluded from a limited public forum on the ground that the subject is discussed from a religious viewpoint." *Id.* at 111–12, 121 S.Ct. 2093; *see also, e.g., Good News/Good Sports Club*, 28 F.3d at 1506–07 (observing that the Supreme Court has "refused to cabin religious speech into a separate excludible speech category").

Here, as noted, defendants argue that worship is different because, *inter alia*, the discrete activities "are linked ... by ceremony and ritual [and] may involve rituals with special significance for a particular religious faith." (Def. Mem. Opp'n P.I. at 27). The record, however, reflects use of public middle school facilities by various groups that also engage in ceremony and ritual of particular significance to the group. For example, Dave Laguer, Director of the Legionnaire Greys Program,

**9.** Indeed, the Supreme Court had already expressly considered such an argument in *Widmar*. There, the majority noted that "the dissent seems to attempt a distinction between the kinds of religious speech explicitly protected by our cases and a new class of religious 'speech act[s],' constituting 'worship.' " 454 U.S. at 270 n. 6, 102 S.Ct. 269 (citation omitted). The Court rejected that distinction:
> [T]he dissent fails to establish that the distinction has intelligible content. There is no indication when "singing hymns, reading scripture, and teaching biblical principles," cease to be "singing, teaching, and reading"—all apparently forms of "speech," despite their religious subject matter—and become unprotected "worship."

*Id.* at 270 n. 7, 102 S.Ct. 269 (citations omitted).

**10.** As noted earlier, in the Court of Appeals' opinion in *Bronx Household*, the majority observed that "religious worship services may well be considered the ultimate in speech from a religious viewpoint in an open forum." 127 F.3d at 215.

explains that the group meets in M.S. 206B on Fridays from 6 to 9 p.m. and on Saturday from 9 a.m. to 2 p.m. and counts approximately sixty to seventy people in attendance from age ten. (First Affidavit of Dave Laguer, sworn to on December 13, 2001 ("Laguer Aff.") ¶ 2). The group's program is geared toward teaching United States history, and because "the format of [its] meetings is framed in an army military style environment, uniforms are required, ranks are held and salutes are mandatory to higher ranked individuals just as in the military." (*Id.* ¶ 3). Lageur also explains that:

> at the start of each meeting, the students line up into proper formation and stand at attention as we begin with ceremonial flag presentation. During this ceremony, the flags are brought in and posted while a trumpeter plays the national anthem. At this time, the students stand at attention and salute while the colors are presented and then posted.

(*Id.* ¶ 4).

Likewise, Jeffrey G. Fanara, the Director of Learning for Life and Urban Emphasis at the Greater New York Councils, Boy Scouts of America, describes the activities of the four Cub Scout Packs and six Boy Scout Troops that meet in New York City public schools in the Bronx. (Affidavit of Jeffrey G. Fanara, sworn to on Dec. 17, 2001 ("Fanara Aff.")). Each Scout takes an oath promising: "On my honor I will do my best [t]o do my duty to God and my country...." (*Id.* ¶ 3). Troop meetings start with an initial gathering period "followed by a formal opening ceremony," and end with a "formal closing ceremony." (*Id.* ¶ 5). An induction ceremony is held for each new boy who joins

the Troop, and advancements in rank "are marked by more elaborate ceremonies called Courts of Honor." (*Id.* ¶ 9). On the basis of this uncontradicted evidence, there is no dispute that the Greys Legionnaires engage in ceremony and ritual at M.S. 206B and that the Boy Scouts engage in ceremony and ritual at various New York City public schools in the Bronx.[11]

To the extent that the School District's denial of plaintiffs' application was based on their including ceremony and ritual (as suggested in defendants' brief quoted above), it was apparently because the ceremony and ritual involved is religious ceremony and ritual. Such an exclusion runs afoul of the Court's holdings in *Good News Club, Lamb's Chapel* and *Rosenberger* that the government may not treat activities that are similar to those previously permitted as different in kind just because the subject activities are conducted from a religious perspective.

3. Even If "Worship" Were an Activity Different In Kind from Activities Previously Permitted In the Forum, It Cannot and May Not Be Effectively Regulated

██ If, however, as defendants argue, plaintiffs propose to engage in an activity labeled "worship" that is different in kind from other activities permitted by the School District, the questions then squarely presented in this case are: (1) can one distinguish between viewpoint discrimination and discrimination based on content when the subjects include religion, prayer, character, morals, the welfare of the community and the like, on one hand, and worship, on the other; and (2) may the government engage in such analysis consistent with the First Amendment?

---

**11.** Fanara's affidavit does not indicate specifically whether the Boy Scout ceremonies have occurred at M.S. 206B—although I note that the School District approved the Boy Scouts of America for "Extended Use" permits during the 2000–01 school year for various activities. (Pagliuca Decl., Ex. C).

a. Distinction Cannot Be Made

Although question (1) was not squarely presented in *Good News Club,* the futile quest that Judge Jacobs presciently foresaw there arises here. A reading of the Supreme Court's jurisprudence in this area reveals the Court's increasing difficulty in distinguishing religious content from religious viewpoint where morals, values and the welfare of the community are concerned.

In *Widmar,* the University of Missouri at Kansas City (the "University") permitted a variety of student groups to meet in its facilities, and from 1973 until 1977, a registered student group called Cornerstone was granted permission to meet on University premises. Cornerstone was "an organization of evangelical Christian students from various denominational backgrounds, ... and [a] typical Cornerstone meeting included prayer, hymns, Bible commentary, and discussion of religious views and experiences." 454 U.S. at 263 n. 2, 102 S.Ct. 269. In 1977, the University withdrew its permission for Cornerstone to meet on University premises on the basis of an earlier-passed regulation prohibiting the use of University facilities "for purposes of religious worship or religious teaching." *Id.* at 263, 102 S.Ct. 269.

The Supreme Court ruled against the University in an opinion by Justice Powell; Justice Stevens filed a concurring opinion, and Justice White filed a dissent. The Court held that the University had created a forum generally open for use by student groups, *id.* at 267, 102 S.Ct. 269,[12] and that it "had discriminated against student groups and speakers based on their desire to use a generally open forum to engage in religious worship and discussion," *id.* at 269, 102 S.Ct. 269. In recognizing that religious worship and discussion are "forms of speech and association protected by the First Amendment," *id.,* as noted above, the Court rejected the categorization of worship as a separate class of religious speech, *id.* at 270 n. 7, 102 S.Ct. 269.[13] The Court emphasized that the basis of its holding was the University's content-based exclusion of religious speech in the open university forum:

> Having created a forum generally open to student groups, the University seeks to enforce a content-based exclusion of religious speech. Its exclusionary policy violates the fundamental principle that a state regulation of speech should be content-neutral, and the University is unable to justify this violation under applicable constitutional standards.

*Id.* at 278, 102 S.Ct. 269.

In *Lamb's Chapel,* the Board of the Center Moriches Union Free School District had also adopted a forum limitation, specifically a policy pursuant to Section 414 opening its facilities to "social, civic or recreational use" but prohibiting use "for religious purposes." 508 U.S. at 387, 113 S.Ct. 2141. Pursuant to this policy, the school district denied the application of plaintiffs Lamb's Chapel (an evangelical church) and its pastor to use school facilities for a film series dealing with family and child-rearing issues and containing the message that contemporary media influences "could only be counterbalanced by returning to traditional, Christian family

---

**12.** Most courts have interpreted the Court as having treated the University's forum as a limited public forum. *See, e.g., Summum v. Callaghan,* 130 F.3d 906, 914 (10th Cir.1997) ("In *Widmar v. Vincent,* for example, the Supreme Court held that a state university had created a 'limited public forum.' ") (citation omitted); *Doe v. Duncanville Indep. Sch. Dist.,* 994 F.2d 160, 165 (5th Cir.1993) ("*Widmar* undeniably premised its constitutional conclusions on the existence of a limited public forum.").

**13.** *See supra* note 9.

values." *Id.* at 388, 113 S.Ct. 2141. The school district denied plaintiffs' first application because the film was "church related," *id.* at 388–89, 113 S.Ct. 2141, as well as the second application which characterized the film as a "[f]amily oriented movie—from a Christian perspective." *Id.* at 389, 113 S.Ct. 2141.

In the Supreme Court, the school district argued that excluding this category of "church related" speech was reasonable because, *inter alia*, all religions and all religious uses were treated the same way. *Id.* at 393, 113 S.Ct. 2141. The Court, however, did not view the policy as content-based but as an impermissible viewpoint restriction. It noted that lectures on child rearing and family values were within the "social or civic purposes" for which the forum was open and held that the school district's denial of plaintiffs' application on the basis of its religious perspective was invalid. *Id.* at 393–94, 113 S.Ct. 2141. Justice White delivered the opinion of the Court; Justice Kennedy concurred in part and in the judgment; and Justice Scalia, joined by Justice Thomas, concurred in the judgment.

In *Rosenberger*, which was decided just two years after *Lamb's Chapel*, the Court considered the University of Virginia's limited forum where Student Activities Funds were available to student groups for activities "related to the educational purpose of the University," including "student news,

information, entertainment or academic communications media groups." 515 U.S. at 824, 115 S.Ct. 2510. The funding was not available for religious activity or activity that "primarily promotes or manifests a particular belie[f] in or about a deity or an ultimate reality." *Id.* at 825, 115 S.Ct. 2510. Plaintiffs' student organization sought funding to publish "Wide Awake: A Christian Perspective at the University of Virginia" which, according to its editors, "offer[ed] a Christian perspective on both personal and community issues, especially those relevant to college students at the University of Virginia." *Id.* at 826, 115 S.Ct. 2510. The paper committed "to challenge Christians to live, in word and deed, according to the faith they proclaim and to encourage students to consider what a personal relationship with Jesus Christ means." *Id.* The plaintiffs' application for funding was denied on the ground that the paper was a "religious activity" within the meaning of the forum rules. *Id.* at 827, 115 S.Ct. 2510.

Just like the Board of the Center Moriches Union Free School District in *Lamb's Chapel*, the University of Virginia argued in the Supreme Court that its rules were based on content—specifically, religious activity—and not viewpoint. *Id.* at 830, 115 S.Ct. 2510. In response, the Court acknowledged the difficulty in discerning content discrimination from viewpoint discrimination [14] but concluded that

---

**14.** The Court wrote:

> As we have noted, discrimination against one set of views or ideas is but a subset or particular instance of the more general phenomenon of content discrimination. *See, e.g., R.A.V. [v. St. Paul,* 505 U.S. 377,] 391, 112 S.Ct. 2538 [1992]. And, it must be acknowledged, the distinction is not a precise one. It is, in a sense, something of an understatement to speak of religious thought and discussion as just a viewpoint, as distinct from a comprehensive body of thought. The nature of our ori-

> gins and destiny and their dependence upon the existence of a divine being have been subjects of philosophic inquiry throughout human history. We conclude, nonetheless, that here, as in *Lamb's Chapel*, viewpoint discrimination is the proper way to interpret the University's objections to Wide Awake. By the very terms of the SAF prohibition, the University does not exclude religion as a subject matter but selects for disfavored treatment those student journalistic efforts with religious editorial viewpoints. Religion may be a vast area of inquiry,

"[t]he prohibited perspective, not the general subject matter, resulted in the refusal to [fund plaintiffs' paper], for the subjects discussed were otherwise within the approval category of publications." *Id.* at 831, 115 S.Ct. 2510. Justice Kennedy delivered the opinion of the Court; Justices O'Connor and Thomas filed concurring opinions; and Justice Souter filed a dissenting opinion in which Justices Stevens, Ginsburg and Breyer joined.

Although the majority in *Good News Club* termed Milford's exclusion of the Club as "indistinguishable" from the exclusions in *Lamb's Chapel* and *Rosenberger*, see 533 U.S. at 107, the Court seemed to labor to apply the content/viewpoint distinction, perhaps most evidently in the concurring and dissenting opinions. In concurring, Justice Scalia noted that the Court had "previously rejected the attempt to distinguish worship from other religious speech, saying that 'the distinction has [no] intelligible content,' and further, no 'relevance' to the constitutional issue." *Id.* at 126, 121 S.Ct. 2093 (Scalia, J., concurring) (quoting *Widmar*, 454 U.S. at 269 n. 6, 102 S.Ct. 269). According to Justice Scalia, "[t]hose holdings are surely proved correct today by the dissenters' inability to agree, even between themselves, into which subcategory of religious

speech the Club's activities fell." *Id.* at 126–27, 121 S.Ct. 2093.

In dissent, Justice Stevens divided religious speech into three categories: (1) "speech about a particular topic from a religious point of view," (2) "worship, or its equivalent," and (3) "proselytizing or indicating belief in a particular religious faith." *Id.* at 130, 121 S.Ct. 2093 (Stevens, J., dissenting). He acknowledged that a school may create a limited public forum that allows "speech about a particular topic from a religious point of view," *id.*, but opined that a school can "allow discussion of topics such as moral development from a religious (or non-religious) perspective without thereby opening its forum to religious proselytizing or worship," *id.* at 132, 121 S.Ct. 2093. He acknowledged, however, that "[t]he line between the various categories of religious speech may be difficult to draw...." *Id.* at 133, 121 S.Ct. 2093. He found that in opening its forum for "religious purposes," Milford "did not intend to exclude all speech from a religious point of view ... [but] sought only to exclude religious speech whose principal goal was to 'promote the gospel.'" *Id.* at 132–33, 121 S.Ct. 2093.

Justice Souter, joined in dissent by Justice Ginsburg, believed that "the sole question" was whether "Milford was misapply-

but it also provides, as it did here, a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered. The *prohibited perspective*, not the general subject matter, resulted in the refusal to make third-party payments, for the subjects discussed were otherwise within the approved category of publications.

The dissent's assertion that no viewpoint discrimination occurs because the Guidelines discriminate against an entire class of viewpoints reflects an insupportable assumption that all debate is bipolar and that antireligious speech is the only response to religious speech. Our understanding of the complex and multifaceted nature of public

discourse has not embraced such a contrived description of the marketplace of ideas. If the topic of debate is, for example, racism, then exclusion of several views on that problem is just as offensive to the First Amendment as exclusion of only one. It is as objectionable to exclude both a theistic and an atheistic perspective on the debate as it is to exclude one, the other, or yet another political, economic, or social viewpoint. The dissent's declaration that debate is not skewed so long as multiple voices are silenced is simply wrong; the debate is skewed in multiple ways. *Id.* at 830–32, 115 S.Ct. 2510 (emphasis added).

ing its unchallenged restriction in a way that amounted to imposing a viewpoint-based restriction on what could be said or done by a group entitled to use the forum for an educational, civic, or other permitted purpose." *Id.* at 136, 121 S.Ct. 2093 (Souter, J., dissenting). He concluded that Milford was not, because, after dissecting the Club's activities at length, he found the activities to amount to "an evangelical service of worship," rather than the "mere discussion of a subject from a particular, Christian point of view." *Id.* at 138–39, 121 S.Ct. 2093.

Of most relevance for present purposes, of course, is the majority opinion where, as noted above, the Court analyzed the various component parts of the Good News Club's meeting before deciding that the Milford's rejection of the Club's application was viewpoint-based discrimination and thus impermissible. Unlike Justice Souter in dissent, *id.* at 138 n. 3, 121 S.Ct. 2093, the majority did not characterize the Club's activities as worship, *id.* at 112 n. 4, 121 S.Ct. 2093. Thus, the Court's citation to Judge Jacobs' characterizing as "quixotic" any attempt to distinguish between the teaching of character and morals from a religious viewpoint and religious subject matters is arguably dictum. That dictum, however, foreshadowed the result that is compelled here.

Here, plaintiffs propose to engage in "worship" as defined by Pastor Hall, a topic covered by defendants in his deposition:

Q. How do you define "worship services"?

A. The way I teach it is that the word "worship" itself is a neutral word. It does not have inherently any religious connotation, that the word literally means "to ascribe worth to something." And then I go from there to say that we are all creatures of worship, that there is some-

thing that we will ascribe worship or praise to. We will ascribe worship or praise to David Wells when he almost pitched a second no-hitter. I was at that game. We will praise a sunset. We will praise a work of art. We will ascribe worth and value to something that we find valuable and worthy of our praise so that it is a human phenomenon.

Q. Do you characterize your Sunday services as worship services?

A. We ascribe worth, our supreme worth, to Jesus Christ.

Q. So do you agree that your services are worship services?

A. In that sense that I have used it, that I have defined the word, yes.

(Declaration of Lisa Grumet, sworn to on Dec. 5, 2001, Ex. I, Deposition of Robert G. Hall ("Hall Dep."), at 41–42). By ascribing worth to non-religious attributes, *e.g.*, pitching prowess, or items, *e.g.*, a sunset or a piece of art, such "worship" falls within the School District's SOP permitting "instruction in the arts" (SOP 5.6.1) or "social, or recreational meetings ... pertaining to the welfare of the community" (*id.* 5.6.2). Because plaintiffs ascribe worth to a variety of non-religious attributes and items but also ascribe their supreme worth to Jesus Christ, their activities fall within SOP 5.6.2, albeit from a religious perspective.

Similarly, plaintiffs' proposed activities benefitting the community, *e.g.*, aiding the needy and counseling those involved in drugs or other criminal activity (Hall Aff. ¶¶ 3, 5–8), taken together with Pastor Hall's explanation that plaintiffs' Sunday morning meeting "provides the theological framework to engage in activities that benefit the welfare of the community" (*id.* ¶ 7), fall within activities permitted by SOP 5.6.2, albeit from a religious perspective. Just as in *Widmar*, singing hymns, biblical reading and instruction are among the ac-

tivities in which plaintiffs propose to engage. (*Id.* ¶ 4). Singing, instruction in various branches of learning and, as noted above, ceremony and ritual are regularly permitted in M.S. 206B. Indeed, while section 5.11 of the School District's SOP prohibits "religious services or religious instruction," it expressly permits "discussing religious material or material which contains a religious viewpoint...." Defendants, however, argue that some or all of these activities constitute a separate class of religious speech called worship.

How, then, can one locate the line that divides (1) worship and (2) non-worship or (1) religious services and instruction and (2) discussion of religious material or material which contains a religious viewpoint? [15] Judge Jacobs summed up the problem in his *Good News Club* dissent:

> The distinction between content discrimination and viewpoint discrimination is elusive and subtle. "Viewpoint discrimination is ... an egregious form of content discrimination." *Rosenberger,* 515 U.S. at 829, 115 S.Ct. at 2516. "[D]iscrimination against one set of views or ideas is but a subset or particular instance of the more general phenomenon of content discrimination. And, it must be acknowledged, the distinction is not a precise one." *Id.* at 830–31, 115 S.Ct. at 2517 (internal citation omitted). The distinction is especially slippery where the viewpoint in question is religious, in part because the sectarian religious perspective will tend to look to the deity for answers to moral questions. The idea that moral values take their shape and force from God seems to me to be a viewpoint for the consideration of moral questions. True, religious answers to questions about morals and character tend to be couched in overtly religious terms and to implicate religious devotions, but that is because the sectarian viewpoint is an expression of religious insight, confidence or faith—not because the religious viewpoint is a change of subject:

> > It is, in a sense, something of an understatement to speak of religious thought and discussion as just a viewpoint, as distinct from a comprehensive body of thought.... Religion may be a vast area of inquiry, *but it also provides ... a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered.*

*Good News Club,* 202 F.3d at 514 (quoting *Rosenberger,* 515 U.S. at 831, 115 S.Ct. 2510) (Jacobs, J., dissenting). Based on the compelling logic of Judge Jacobs' dissent and the Court's dictum in *Good News Club,* I find it impossible to distinguish between, on one hand, activities proposed by the plaintiffs that are within the activities expressly permitted in this forum, *viz.,* discussing religious material or material which contains a religious viewpoint and activities contributing to the welfare of the community and, on the other hand, an activity different in kind called worship.[16]

---

**15.** An observation by the Court of Appeals in *Good News Club* illustrates the point:

> It is difficult to see how the Club's activities differ materially from the "religious worship" described in *Full Gospel Tabernacle [v. Cmty. Sch. Dist. 27,* 164 F.3d 829 (2d Cir.1999) (per curiam)]: each has prayers and devotional song; each has a central sermon or story with a message; each has a portion in which attendees are called upon to be "saved." Applying a different label to the same activities does not change their nature or import.

202 F.3d at 510.

**16.** In a footnote to the original *Bronx Household* case before me in 1995, I rejected plaintiffs' contention that "the SOP's permitting social, civic and other community welfare topics must, by its very breadth, be read to encompass religious worship." 1996 WL 700915, at *5 n. 1. The basis for this rejection was that "[h]istorically and constitutionally in

(*See* Letter Br. from Eytah A. Kobre, Agudath Israel of America, to the Court, dated Dec. 17, 2001 ("Agudath Br."), at 3 (arguing that, even if plaintiffs' proposed activities are different from the activities permitted in *Good News Club*, it is "a distinction without any discernable difference")).

Aside from the weighty secular precedents referred to above, I note that the Encyclopedia of Religion has found a similar difficulty. In the entry relating to ceremony and religion, the commentator states:

> [A] strict distinction between secular and religious activity is problematic. Historical phenomena do not exhibit the discrete boundaries found in precise theoretical categories. Although they are dissociated from institutionalized religion, many secular rituals make reference to religious belief or make use of religious symbols. The invocation of God and the use of the Bible in presidential inaugurations and Memorial Day observances in the United States and in coronations in Great Britain are illustrative.

(Bobby C. Alexander, *Ceremony, in* 3 The Encyclopedia of Religion 181 (Mircea Eliade ed., 1987) (citations omitted)). In discussing civil religion, "a form of religion characteristic of highly secularized and technologically oriented modern nation states," the commentator cites the following example:

> In the United States, for example, the use of Judeo–Christian symbols in presidential inaugurations, State of the Union addresses, Memorial Day celebrations, funerals of national leaders, and the like

are intended to secure the continuation of divine blessing on the social and political order.

(*Id.* at 181–82 (citations omitted)). The commentator proceeds to describe "the blurring of boundaries between religious and secular ritual" in the Fiesta celebration in Santa Fe, New Mexico, and other Hispanic–American celebrations. (*Id.* at 182). It is a similar blurring of boundaries—evident in the Supreme Court's apparently increasing difficulty in dealing with these topics—that renders impossible the distinctions defendants seek to draw. *See, e.g., DeBoer,* 267 F.3d at 568–69 (holding that National Day of Prayer assembly is a "civic program or activity" and that "worship and prayer directed toward the betterment of government and the enlightenment of civic leaders are methods of expressing a religious viewpoint about civic subject matter").

### b. Distinction Should Not Be Made

Finally, even if it were possible to distinguish between various activities already permitted in the forum from a religious perspective and worship, the answer to question (2) above is a resounding "no": the government may not, consistent with the First Amendment, engage in dissecting speech to determine whether it constitutes worship. As Judge Jacobs stated in dissent in the Court of Appeals' *Good News Club* decision:

> Even if one could not say whether the Club's message conveyed religious content or religious viewpoints on otherwise-permissible content, we should err on the side of free speech. The concerns supporting free speech greatly

---

this country ... religion cannot be lumped with other social, civic and community welfare activities" and that, therefore, "the assumption that broadly stated purposes such as 'civic' and 'community' must also encompass 'religious' is unfounded." *Id.* To the

extent that that footnote treated religious activities consistent with the purposes of the forum as different in kind from other activities allowed in the forum, it is precluded by *Good News Club.*

outweigh those supporting regulation of the limited public forum.

\*　　\*　　\*　　\*　　\*　　\*

Whenever public officials, in executing the school's access policy, evaluate private speech "to discern [its] underlying philosophic assumptions respecting religious theory and belief," the result is "a denial of the right of free speech." *Rosenberger*, 515 U.S. at 845, 115 S.Ct. at 2525.

202 F.3d at 515 (Jacobs, J., dissenting); *see also, e.g., Bronx Household*, 127 F.3d at 221 ("In some circumstances, enforcement of the exclusion of religious 'services' might lead to 'excessive entanglement with religion.'") (Cabranes, J., concurring) (quoting *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971)); *Lee v. Weisman*, 505 U.S. 577, 616–17, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (Souter, J., concurring) (observing that "I can hardly imagine a subject less amenable to the competence of the federal judiciary, or more deliberately to be avoided where possible" than "comparative theology"); A. Louise Oliver, *Tearing Down the Wall: Rosenberger v. Rector of the University of Virginia*, 19 Harv. J.L. & Pub. Pol'y 587, 594 n. 57 (1996) ("The Supreme Court has refused to define the 'centrality' of worship activities in the Free Exercise context because such a definition would entail too great an examination into the tenets of particular religions.") (citing *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 457–58, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988)); Richard W. Garnett, *A Quiet Faith? Taxes, Politics, and the Privatization of Religion*, 42 B.C. L.Rev. 771, 795 (2001) ("[T]he opinions in Good News ... call for caution. They should prompt us to wonder how government is able to distinguish religious purposes from secular ones, worship from perspective, discussion from proselytization."); Agudath Br. at 4 ("As numerous Supreme Court decisions have recognized, it is within neither the role nor the competence of governmental bodies to determine the significance of a religion's beliefs and practices for its practitioners.").

Here, in order to execute its policy of prohibiting worship but permitting discussion of religious material or material that contains a religious viewpoint (SOP 5.11), the School District would be required to dissect and categorize the substance of plaintiffs' speech during their four-hour meeting and determine, *inter alia*, "when 'singing hymns, reading scripture, and teaching biblical principles,' cease to be 'singing, teaching, and reading' ... and become unprotected 'worship,'" *Widmar*, 454 U.S. at 270 n. 6, 102 S.Ct. 269 (citation omitted). (*See* Hall Aff. ¶ 4 ("In our church service, we seek to give honor and praise to our Lord and Savior Jesus Christ in everything that we do. To that end we sing songs and hymns of praise to our Lord. We read the Bible and the pastors teach from it because it tells us about God, what He wants us to do and how we should live our lives.")).

In worshiping or ascribing worth to a variety of values and skills (*see* Hall Dep. at 41–42), plaintiffs' meetings are no different from other meetings permitted in the school. Although the record is silent, one can presume that the Little Leaguers of Love Gospel–BX, the Semanonans Stickball players and the youth basketball players of the Hebrew Institute of Riverdale— all of whom were approved by the School District for Extended Use permits in 2000–01 (Pagliuca Decl., Ex. C)—would likely join plaintiffs in worshiping David Wells' pitching prowess. The Greys Legionnaires ascribe worth to "hav[ing] character and be[coming] model citizens of the United States" through learning "the importance of qualities such as honesty, integrity, teamwork, etc." (Lageur Aff. ¶ 6).

The Boy Scouts ascribe worth to "reinforc[ing] in young people the traditional moral values reflected in the Scout Oath and Law." (Fanara Aff. ¶ 3). Plaintiffs ascribe their ultimate worth as human beings to Christ. (*See* Hall Dep. at 41–42 ("We ascribe worth, our supreme worth, to Jesus Christ.")).[17] To permit, indeed, to require the School District "to evaluate private speech 'to discern [its] underlying assumptions respecting religious theory and belief'" and to make a determination whether that speech is discussion of religious material or worship is "a denial of the right of free speech." *Rosenberger*, 515 U.S. at 845, 115 S.Ct. 2510.

For all of the above reasons, I find that plaintiffs have demonstrated a substantial likelihood of success on the merits of their First Amendment free speech claim.

B. Establishment Clause

■ Plaintiffs assert that permitting other community groups to use the school facilities but excluding religious services and instruction violates the Establishment Clause of the First Amendment. (Compl.¶ 31). Defendants, in turn, assert that they have a compelling state interest in avoiding an Establishment Clause violation by denying plaintiffs' request to rent space in M.S. 206B. (Defs. Mem. Opp'n P.I. at 32–35).

The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. In *Good News Club*, the Court rejected Milford's contention that even if it engaged in viewpoint discrimination, that discrimination was necessary to avoid violation of the Establishment Clause. 533 U.S. at 113–14, 121 S.Ct. 2093. For support, the Court pointed to *Lamb's Chapel* and *Widmar*:

> In *Lamb's Chapel*, the Court explained that "[t]he showing of th[e] film series would not have been during school hours, would not have been sponsored by the school, and would have been open to the public, not just church members." 508 U.S. at 395, 113 S.Ct. at 2141. Accordingly, *Lamb's Chapel* found that "there would have been no realistic danger that the community would think that the District was endorsing religion or any particular creed." *Ibid.* Likewise, in *Widmar*, where the university's forum was already available to other groups, this Court concluded that there was no Establishment Clause problem. 454 U.S. at 272–273, and n. 13, 102 S.Ct. at 269.

*Id.* at 113, 121 S.Ct. 2093. The Court concluded that the Establishment Clause "fare[d] no better in this case," because "the Club's meetings were held after school hours, not sponsored by the school, and open to any student who obtained parental consent, not just club members." *Id.* The Court also noted that, "[a]s in *Widmar*, Milford made its forum available to other organizations." *Id.* Further, the Court rejected Milford's attempts to distinguish *Lamb's Chapel* and *Widmar* on the basis that elementary school children were involved. Specifically, the Court held that: (1) allowing the Good News Club to speak on school grounds "would ensure neutrality, not threaten it"; (2) to the extent that it would "consider whether the community would feel coercive pressure to engage in the Club's activities, the relevant community would be the parents, not the elementary school children," because the

---

17. In addition to illustrating the impermissible degree of government exploration of the tenets of plaintiffs' faith and the nature and content of their speech that is required by SOP 5.11, these comparisons also tend to illustrate the "elusive and subtle" distinction between content discrimination and viewpoint discrimination. *Good News Club*, 202 F.3d at 514 (Jacobs, J., dissenting).

children could not attend without their parents' permission; and (3) it has "never extended [its] Establishment Clause jurisprudence to foreclose private religious conduct during nonschool hours merely because it takes place on school premises where elementary school children may be present." *Id.* at 114–15, 121 S.Ct. 2093; *see also, e.g., Capitol Square Review & Advisory Bd. v. Pinette,* 515 U.S. 753, 777, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (O'Connor, J., concurring) (observing that, to assess properly an Establishment Clause violation claim, one must consider whether a plaintiff has "so dominate[d]" a forum that children would perceive endorsement by the school of a particular religion). The Court observed that the individuals giving the lessons in *Good News Club* were not schoolteachers, there was no evidence that children were permitted to loiter around the school after school hours and the children who participated in the group were not all the same age as in a normal classroom setting. *Good News Club,* 533 U.S. at 117–18, 121 S.Ct. 2093.

As in *Good News Club,* there is a substantial likelihood that plaintiffs will be able to demonstrate here that defendants do not have a compelling state interest in avoiding an Establishment Clause violation by denying plaintiffs' request to rent space at M.S. 206B. Plaintiffs' proposed meetings would occur on Sunday mornings—*i.e.,* during nonschool hours. (*E.g.,* Hall Aff. ¶ 3).[18] The meetings are obviously not endorsed by the School District. (*Id.* ¶ 15). No M.S. 206B employee attends plaintiffs' Sunday morning meetings. (Hall Dep. at 32). Further, the meetings are "open to all members of the public" and "not closed to a limited group of peo-

ple, such as church members and their guests." (Hall Aff. ¶ 5). Nor is there any evidence that children are present around M.S. 206B on Sunday mornings or that any M.S. 206B students even attend plaintiffs' Sunday school or services. (Hall Dep. at 31–32). In short, it can hardly be said that plaintiffs' proposed meetings would so dominate M.S. 206B that children would perceive endorsement by the School District of a particular religion. Indeed, permitting plaintiffs to hold their Sunday morning meetings "would ensure neutrality, not threaten it," because plaintiffs are "seek[ing] nothing more than to be treated neutrally and given access to speak about the same topics as are other groups." *Good News Club,* 533 U.S. at 114, 121 S.Ct. 2093; *see also Bd. of Educ. v. Mergens,* 496 U.S. 226, 248, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) ("[I]f a State refused to let religious groups use facilities open to others, then it would demonstrate not neutrality but hostility toward religion."). Here, because the School District's policy is hostile to religion, not neutral, plaintiffs are substantially likely to succeed in demonstrating that permitting them to hold their Sunday morning meetings at M.S. 206B would not violate the Establishment Clause.

## C. Plaintiffs' Remaining Claims

Because I find that plaintiffs have demonstrated a substantial likelihood of success with respect to their free speech claim, and that defendants lack a compelling state interest in preventing plaintiffs from renting space in M.S. 206B for their Sunday morning meetings so as to avoid violation of the Establishment Clause,

---

18. *See, e.g.,* Charles J. Russo & Ralph D. Mawdsley, *And the Wall Keeps Tumbling Down: The Supreme Court Upholds Religious Liberty in Good News Club v. Milford Central School,* 157 Ed. Law Rep. 1, 12 (2001) ("One can argue that, if refusing to provide equal access to religious groups during school hours can represent hostility, then hostility would seem to be an even more plausible claim when the access sought is after school hours.").

there is no need to address the remaining assertions contained in plaintiffs' complaint at this juncture.

### CONCLUSION

Plaintiffs' motion for a preliminary injunction to prevent defendants from denying plaintiffs' application to rent space in Public School M.S. 206B, Anne Cross Merseau Middle School, for Sunday morning meetings that include religious worship is granted. Counsel shall confer and deliver a proposed form of preliminary injunction no later than June 28, 2002. If they are not in agreement, counsel shall appear at a conference to discuss the proposed order on July 1, 2002, at 9:00 a.m., Courtroom 12A, United States District Court, Southern District of New York, 500 Pearl Street, New York, New York.

SO ORDERED.